# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 17, 2012 Session

## STATE OF TENNESSEE v. NATAYNA DAEMARIE MCCULLOUGH

### Appeal from the Circuit Court for Maury County
#### No. 18087   Jim T. Hamilton, Judge

---

### No. M2011-01926-CCA-R3-CD - Filed October 25, 2012

---

The Defendant, Natayna Daemarie McCullough, was convicted by a Maury County jury of facilitation of attempted especially aggravated robbery, a Class C felony. Following a sentencing hearing, the trial court imposed the maximum six-year term and denied judicial diversion or any form of alternative sentencing. In this direct appeal, the Defendant challenges (1) the sufficiency of the evidence; (2) several evidentiary rulings, including an alleged <u>Brady</u> violation and limitations on two witnesses' testimony; and (3) various sentencing determinations, including the imposition of the maximum sentence, and the denial of judicial diversion or any other form of alternative sentencing. After a thorough review of the record and the applicable authorities, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Lorraine Wade (at trial), and Patrick T. McNally (on appeal), Nashville, Tennessee, for the appellant, Natayna Daemarie McCullough.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; T. Michel Bottoms, District Attorney General; and Kimberly L. Fields Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
#### FACTUAL BACKGROUND

This case arises from a four-man attack on the victim, Anthony Wayne McCord, shortly before midnight on May 17, 2008. During their attempt to rob him, one of the men shot the victim multiple times. The Defendant drove the four men to and from the victim's

neighborhood. She was indicted on July 23, 2008, with attempted first degree murder and especially aggravated robbery. Before trial began, the attempted first degree murder charge was dismissed, and the especially aggravated robbery charge was amended to reflect a charge of attempted especially aggravated robbery.

At trial, the victim testified that on May 17, 2008, he lived on Todd Carter Road, in Countryside Village, where he provided support to his mother and son who also lived there. His mother "just had cancer surgery" and was "going through a pretty rough time," so he was staying there to care for her. At that time, he was employed as a truck driver and worked for Seventh Transport in Spring Hill. He did not know any of the defendants prior to these events.

According to the victim, it was hot inside that evening, so he went outside "to cool off a little bit." He was outside talking to his girlfriend on the telephone when he noticed four young men walking down the road towards him throwing a football back and forth. He did not know these young men. A "couple of minutes" later, one of the young men approached him and asked for a cigarette, which he gave. The young man returned to his group, who were all standing in the road talking. "A few seconds later, another young boy approached [him] and said, 'Hey, man, give me your damn money.'" The victim replied that he did not have any money as he was a single dad, caring for both his son and mother, and instructed the man "to go on and get away from" him.

According to the victim, the man responded by "buck[ing] up against [him], [and] said, 'Man, I ain't motha f----n' playin' with you, I said give me your d--n money.'" The victim explained that "bucked up" meant that the man pushed his chest up against the victim's. The victim testified that the following events then occurred:

> I pushed him off of me. Another boy come running up behind me, grabbed me in a arm-lock and he went to beating me in my face. And I broke loose from them two, and got over in the yard and got to fighting basically all four of the boys. Uh, I was pretty much outnumbered. The boys were kicking, hitting me from every angle they could kick and hit from.
>
> I was down on the ground over top of one of them, and fighting them back, and one of them got to hollering, "Man, get him off of me, get him off of me; cap him, man, cap him." And the other boy stood behind me, when I was down on my hands and knees, over top of the boy, said, "I'm fixin' to strap him."
>
> . . . .

-2-

I heard gunfire and I was shot multiple, multiple[] times.

The victim never saw the weapon. He also did not see the men get out of a vehicle or any cars in the area.

When asked about the beating, the victim stated that he was hit in the face numerous times and all over his body. Explaining his injuries, the victim testified, "[M]y eye sockets were shattered, nose, face. I believe I had bruised ribs, I think Vanderbilt . . . said I had eight gunshot wounds. Still got six bullets in me that will be in me the rest of my life. Liked to lost my right arm, almost my eyesight." He also testified that when he was shot, he felt "[e]xcruciating pain and burning." According to the victim, he was shot three times in the back, twice under his arm "side by side," once "across" his arm, once in his elbow, and once in his leg.

The victim testified that, after he was shot, all four men "took off running uphill." When asked if he heard anything else after the man said he would "strap him," the victim replied, "There was a lot of things that was being said at the time, but I couldn't quite make out some of the things. Right before they . . . When they took off running, they were laughing at what they had done. When they were running, they was laughing about it." The victim stated that his assailants did not actually get any of his property from him.

When asked if he remembered the police arriving on the scene, the victim responded,

> Well, after being shot, I got up off the ground and I tried walking back into the house. Police officer that was across the street, the county, getting fuel, heard the shots and immediately come flying over in the trailer park and noticed that it was me being -- that I've been shot and come to my aid.

He recalled speaking with the officer. He provided the officer with a description of his assailants, "most of them were wearing red and black clothing at the time," and he told the officer that they had "run in behind the house, somewhere up the hill," fleeing on foot.

The victim testified that he sustained permanent injury to his right arm, suffering from "a lot of nerve and muscle damage" impairing his ability "to a do a lot of things with it." He stated that he had "multiple surgeries done on [his] right arm to save it. About 200 . . . stitches in [the] right arm both times, to save it." The victim testified that he moved from Countryside Village after this incident due to safety issues. He left because there were "[n]umerous rumors going around . . . that they were possible gang members."

On cross-examination, the victim stated that he did not feel alarmed or threatened when one of the assailants, Justin Fox (Fox), asked him for cigarette. After Fox returned to the group and they were standing around talking, the victim heard one of them on the phone. According to the victim, "[o]ne of the boys was on the phone with somebody, telling somebody to get back over to the trailer park." After that, one of the other young men, later identified as DeVontay Webster (DeVontay[1]), approached him, demanding money, and the fight ensued, ending with DeVontay shooting the victim.

Deputy Jason Young of the Maury County Sheriff's Department was the officer fueling his patrol car at Maury County Central Maintenance shortly before midnight on the evening of May 17, 2008. As he was getting gas, he heard approximately six gunshots from the area of Countryside Village, which was "across the street from the fuel pumps, kind of diagonally." From the fuel pumps, one could see the entrance to the neighborhood. After hearing the shots, Deputy Young notified dispatch that he would be responding to Countryside Village for shots fired in the area.

According to Deputy Young, he arrived at the neighborhood within two to three minutes of hearing the gunfire. As he approached, Deputy Young noticed a slow-moving white Volkswagen Beetle leaving the area. This car "stood out" to Deputy Young because of its "unusually slow" rate of speed. As he passed the car, he saw the driver and "maybe four people attempting to duck down in the seat." Deputy Young testified that he "locked eyes" with the female driver: "She watched me and I watched her as we pas[sed] each other." He observed the car stop at a stop sign, before exiting the neighborhood. He did not see any other vehicles in the neighborhood.

Immediately thereafter, Deputy Young was "notified that shots had been fired in the area and had a victim down, multiple gunshot wounds." He, accompanied by Sergeant Samuel Barnes of the Maury County Sheriff's Department, proceeded to the address given. Sergeant Barnes followed behind in a separate vehicle.

Sergeant Barnes testified that he was at the Sheriff's Office when he learned that Deputy Young "was in route to shots fired in the general area across from where he had been pumping gas." Once he received this information, he immediately left his location and proceeded to Countryside Village, which was "less than a minute" away. As he entered the neighborhood, he observed the same white Volkswagen, noting the following: "And as the vehicle was coming by, when I looked over at the vehicle, I could see the driver. The driver appeared very rigid. But I also noticed in the backseat that there were several people that

---

[1] Because witnesses DeVontay Webster and Jasmine Webster share the same last name, we will utilize their first names in referring to them.

were down with their head tucked behind the seats." Sergeant Barnes said that the "behavior was very suspicious and odd at that point in time; especially it being the only vehicle in the general area."

When the two officers arrived on the scene, they encountered the victim, whom Deputy Young described as, "standing up, walking around, talking on a cell phone with blood covering his back." After instructing the victim to get down on the ground, they "[r]aised up his shirt, saw several bullet holes, blood everywhere." They began "administering first aid and compression on his wounds." Sergeant Barnes stated that it was obvious the victim "was in trouble"; his "color being very bad[,] . . . almost whitish blue." As Sgt. Barnes continued to care for the victim, Deputy Young began taping off the crime scene. They provided other responding officers with a description of the suspects given to them by the victim and of the Volkswagen that had been seen exiting the neighborhood. Sergeant Barnes radioed to other en route officers "to look for that vehicle and try to intercept that vehicle." A deputy informed Sgt. Barnes that "he had" the vehicle, and Sgt. Barnes instructed the deputy to stop the Volkswagen.

Emergency medical services (EMS) arrived on the scene and continued with care of victim, who remained conscious during the ordeal. He was ultimately transported to the hospital. Given the victim's perilous condition, Deputy Young went with the victim in order to get "as detailed of a statement as possible from him, a dying declaration, should he pass on." Sergeant Barnes maintained the scene until detectives arrived.

Deputy Joel Willoughby of the Maury County Sherriff's Department was the officer who stopped the Volkswagen. He heard over the radio about the suspect vehicle and encountered it as he was heading towards the scene. Deputy Willoughby testified that he "waited for the vehicle to come up towards [him]" and that he then "hit [his] spotlight to identify if [he] could see anybody in the vehicle." At that time, he only saw one person in the car, the driver, later identified as the Defendant. Deputy Willoughby pulled in behind the car and initiated a stop when Sgt. Barnes "asked that all responding deputies come to his location." Although the vehicle was stopping, Deputy Willoughby "flipped back around to go towards" the scene to see if he could help. Feeling uneasy about abandoning the stop, Deputy Willoughby radioed in to dispatch and was then instructed to stop the vehicle. Deputy Willoughby "flipped back around again" and returned to the Volkswagen Beetle, which "had not moved by that point." According to Deputy Willoughby, less than thirty seconds had elapsed from the time he first left the car to his follow-up return.

After returning to the Volkswagen, Deputy Willoughby turned his spotlight on the car and, as soon as he did, saw multiple suspects in the car. He explained as follows:

It appeared that all of them were crouched down when I initially came up. And when I hit the spotlight on, it was like they all disappeared. It was a shocking moment for me. I thought I was initially stopping one person in a vehicle. And I got there, there was literally a carload of them.

. . . .

At that time, I called over the radio and said that I had multiple suspects in the vehicle. And, at some point, I started getting suspect information as far as clothing, identifications of the suspects coming out of the radio, and I quickly realized that I had suspects there.

. . . .

I initiated a felony stop and waited for some responding officers to come help me take custody or detain[] these subjects for further investigation.

Deputy Willoughby held the suspects at gunpoint and gave them verbal commands to keep their hands up, so that he could make sure that they did not have any weapons in their hands. Once other officers arrived on the scene, they called the suspects out of the vehicle one at a time, so they could search for weapons and detain them. Deputy Willoughby called the driver, the Defendant, out first. DeVontay was in the passenger's seat and was called out next. Deputy Willoughby then went to the individuals in the back seat. The suspects were placed in separate police cars.

After securing all of the suspects, Deputy Willoughby went to the Volkswagen and looked inside. He saw a white shirt and some other clothing on the driver's side backseat of the car with "what appeared to be blood on it." Deputy Willloughby "backed away from the vehicle" and waited for detectives to process the scene. According to Deputy Willoughby, no gun was ever found inside the vehicle.

At that point, Deputy Willoughby went to each of the suspects inside their respective patrol cars and read each individual their Miranda[2] rights. He read them their rights "to make sure the integrity of the investigation was gonna be clean"; however, he did not question them further.

---

[2] See Miranda v. Arizona, 384 U.S. 436 (1996).

-6-

The stop was recorded by the camera[3] on Deputy Willoughby's patrol car. The Defendant was detained inside Deputy Willoughby's car. Deputy Willoughby said that the "video portion of [the] camera" recorded both "outside and inside the car." Deputy Willoughby testified that, while the Defendant was detained inside his car, she made a phone call on her cell phone, which she, unbeknownst to the officers, still had in her possession. The Defendant's words were also recorded by the equipment in Deputy Willoughby's car. A copy of this recording was played for the jury.

In the audio recording, the Defendant, talking to the person she had called, said, "I should have never have come pick these n----rs up. . . . They done searched my car, everything, found blood on one of the mother f---ing shirts." Deputy Willoughby testified that he did not discuss with the Defendant anything about what had been found in her car.

On cross-examination, Deputy Willoughby confirmed that all of the individuals had their shirts on as they exited the Volkswagen. However, he clarified that "[s]ome of them had multiple shirts on."

Deputy Willoughby confirmed that he did not tell the Defendant that she was being recorded and that she was likely unaware of that fact. Deputy Willoughby testified that his "two-way radio" was on during the whole stop and that his radio could be overhead by the Defendant inside the vehicle. According to Deputy Willoughby, the Defendant was cooperative throughout the episode, noting, however, that she was at gunpoint the entire time.

Detective Jerry Williams of the Maury County Sheriff's Department was the "detective on call" on the evening of May 17, 2008. Around midnight that evening, he received a call that there had been a shooting at Countryside Village. He first went to the location where the Defendant's car had been stopped. Detectives Terry Dial and Andy Jackson, also with the Maury County Sheriff's Department, arrived on the scene and assisted Det. Williams with the ensuing investigation.

When Det. Williams arrived on the scene of the stop, the occupants of the car had already been placed in separate patrol cars; he did not talk to any of them at that point in time. The detectives began to "process" the scene, initially by taking photographs and then by collecting evidence. When asked about what evidence was collected, Det. Williams replied, "There was on the driver side in the back floorboard, there was a t-shirt had what appeared to be blood on it. Also, on the passenger side, there was a red shirt. And there was a ski mask[.]" They also collected a jacket left on the console. Detective Williams stated

---

[3] The record suggests that the video recording was played for the jury; however, only the audio portion is playable on the recording provided in the appellate record.

that the glove box was open and confirmed that no weapon was ever found inside the car. The photographs and evidence taken that evening were shown to the jury.

The t-shirt with blood on it, collected from behind the driver's seat, was sent to the Tennessee Bureau of Investigation (TBI) for analysis. The shirt itself was "kind of torn up" when the detectives collected it. Detective Williams was able to determine that the shirt belonged to Fox. After the detectives finished collecting evidence from inside the Volkswagen, the car was towed to the Sheriff's Department impound lot.

After completing their work at the scene of the stop, the detectives proceeded to the location of the shooting, and they processed that scene by photographing, marking, and collecting evidence. Again, the photographs and evidence collected were shown to the jury. Items located and photographed were a cell phone case, along with an "ear bug"; the victim's clothes removed by EMS and left on the scene; a shell casing; and a football. There was a photograph of a vehicle with "what appear[ed] to be blood spattered on" it. Two .22 caliber shell casing were also recovered from the scene. Detective Williams confirmed that the mother of a suspect in the Volkswagen, Lorenzo Russell (Russell), lived in Countryside Village.

The detectives then went to the Sheriff's Department to secure the evidence and interview the occupants of the Volkswagen. During an interview, Det. Dial noticed what appeared to be blood on the shoe of one the suspects. They then looked at that suspect's clothing and noticed that the clothing had blood spots on it too. They then went on to examine the other suspects and collected all of their clothing for analysis. According to Det. Dial, three of the male suspects were believed to have blood on their clothing. They also conducted a gunshot residue test on all of the suspects, including the Defendant.

After Det. Jackson interviewed Fox for a second time, Detectives Dial and Jackson returned to Countryside Village with Fox, who showed them where the handgun had been thrown from the vehicle. The gun was collected and sent to the TBI for analysis. The .22 caliber handgun had a live round in the chamber when it was recovered; it was later determined that the firing pin had struck the round, but "it just did not fire."

Detectives Williams and Dial went to Vanderbilt to meet with the victim. The victim was able to talk "[v]ery little," but they did speak with him. They also took photographs of the victim's injuries. These photographs were shown to the jury. Several days later, Det. Williams returned and collected a bullet that had been removed from the victim's arm.

TBI testing confirmed that the bullet taken from inside the victim was fired by the .22 caliber-handgun recovered by the police following the shooting. Only the clothing of

DeVontay revealed the presence of "gunshot primer residue." Blood found on the clothing of DeVontay, Fox, and Russell was determined to be the victim's. The white and red t-shirts removed from the backseat floorboard were also determined to have the victim's blood on them. No blood or gunshot residue was found on the Defendant's clothing. No fingerprints were found on the gun; however, Det. Williams testified that he received information that DeVontay wore gloves.

Following the denial of the Defendant's motion for judgment of acquittal, she offered the following proof. DeVontay testified that he was a friend of the Defendant's and that on the day of the shooting, he called her to give him, Russell, Fox, and Roshon Nicholson (Nicholson) a ride to Russell's mother's house in Countryside Village. She complied with his request. According to DeVontay, they engaged only in "small-talk" on the car ride on the way over. Once they arrived at Russell's mother's house, all four of them got out of the car. DeVontay testified that he did not say anything to the Defendant when he got out of the vehicle and went into Russell's mother's house.

DeVontay testified to the events of the shooting, stating that they left Russell's mother's house and went walking, throwing a football around. According to DeVontay, it was about fifteen minutes into their walk when they encountered the victim. DeVontay admitted that he had a gun in his pocket and that he used it to shoot the victim. DeVontay testified that he did not discuss the weapon with the Defendant and that he did not call anyone while the men were walking through the neighborhood. According to DeVontay, the decision to rob the victim was made after the Defendant picked them up and brought them to the neighborhood; it was "never planned out."

After shooting the victim, they ran back in the direction of Russell's mother's house. While they were running, DeVontay called the Defendant and asked her to come back and pick them up, which she did. According to DeVontay, they did not say anything about the shooting when they got into the car with the Defendant. DeVontay testified that, as they were leaving the neighborhood, he "cracked the door opened a little" to spit, and he "tossed the gun out." According to DeVontay, he did not tell the Defendant why he opened the door.

On cross-examination, DeVontay confirmed that he had known the Defendant for about a year, that they "were close," and that "[s]he almost considered [him] a brother." DeVontay testified that he had a gun that evening "[j]ust for protection" but acknowledged that he carried it "[a]t times" and that it was "[n]ot unusual" for him to be armed.

When asked how the Defendant pulled in Russell's mother's driveway, DeVontay testified that, "[w]hen we first got there, she pulled straight in the driveway," and they got out of the vehicle. The Defendant stayed in the car. The four men were inside Russell's

mother's house for approximately ten minutes before leaving. They walked through the neighborhood looking for "females." According to DeVontay, they still had no plan at that point.

DeVontay testified that he did not remember saying to Fox that he was "getting ready to strap" the victim or telling Fox and Russell to move out of the way. After running back to Russell's mother's house, they discovered that the Defendant's car was no longer there. He then phoned her to come pick them up at Russell's mother's house. She was "coming back up" the road when they got back to the house. She stopped on the street to let them inside.

DeVontay testified that he did not want anyone to see him throw the gun out. He further stated that the interior light did not come on when he opened the door. He also admitted that he opened the car's glove box that night, trying to put the gloves he wore when he shot the victim inside. He acknowledged that this was "in the front seat of a two-door car, in full view of" the Defendant; however, he was adamant that the Defendant did not know what was going on.

Nicholson, sixteen years old at the time of the shooting, also testified on the Defendant's behalf. Nicholson, who had become friends with the Defendant a couple of months before the shooting, likewise denied having any conversation with the Defendant during the approximate five-minute car ride to Countryside Village. He also testified that, upon their arrival at Russell's mother's house, he got of the car and did not say anything to the Defendant. According to Nicholson, the Defendant stayed in the car, talking to someone on her cell phone.

Nicholson testified that they walked around the neighborhood for about ten or fifteen minutes before they saw the victim. When they saw the victim on the phone, "they were like, do y'all want to rob this guy?" He responded "no." According to Nicholson, they had never before discussed robbing the victim.

After the shots were fired, Nicholson ran back to the car. According to Nicholson, the Defendant was still sitting in the car in the driveway, possibly still talking on the telephone. There was nothing in the backseat when he got inside. He did not say anything to the Defendant once inside. About a minute later, the other men got into the car, and they "pulled off."

Nicholson testified, "Nobody did anything until the first cop [passed] us, and that's when Mr. Webster, he threw the gun out of the window." According to Nicholson, DeVontay rolled down the window, and he "just threw it out." The Defendant did not say

anything when this happened; she "was paying attention to the road." Then, another police car drove by them and ultimately initiated a traffic stop. Still no one said anything to the Defendant.

Nicholson could not recall what t-shirt Fox had on that night, but he recalled that Fox was "very bloody." According to Nicholson, when the Defendant opened the door to get out of the car for the officer, "the lights came on."

On cross-examination, Nicholson testified that the Defendant parked in the driveway when they arrived at Russell's mother's house. Although he was not positive, he thought "[t]he front of the car was facing the road." Nicholson stated that, once they got out of the car, they immediately started walking around; they did not go inside the house. When they started walking, the Defendant was still in the driveway.

After the shooting, he ran back to the car knowing that the Defendant would still be there. Nicholson testified that the Defendant did not leave the driveway; she "was waiting for them." According to Nicholson, DeVontay directed the Defendant out of the neighborhood.

Nicholson stated that Fox took off his shirt as they were exiting the neighborhood after the first police officers passed them. He did not remember if Russell took his shirt off. He did remember the car slowing down so DeVontay could throw the gun out the window. As she was getting pulled over, the Defendant told the men that she was "not running from the police."

On redirect examination, Nicholson stated that the Defendant was simply giving him and Russell a ride home. They went to Countryside Village first because Russell's mother's house "was closer."

Deputy Willoughby was re-called and reminded of his testimony that he never told the Defendant about the bloody shirt found in the back of the car. When asked if he talked about the shirt at all during the stop, Deputy Willoughby replied, "I believe that I had called my supervisor on the phone and told him about it." However, anything said over Deputy Willoughby's "microphone" would not have been broadcast into the patrol car.

The Defendant's grandmother, Mabel McCullough (Ms. McCullough), testified that she paid her granddaughter's rent and that she had purchased the Volkswagen for the Defendant to drive to and from work. The Defendant would often give her friends rides in the car. When asked if the Defendant would ever be in need of money, Ms. McCullough

said, "She had no need to need money. I kept her supplied with gas in her car, money in her pocket, and she had her own job."

The Defendant testified on her own behalf. She stated that on May 17, 2008, she was with her girlfriend, Jasmine Webster (Jasmine), when DeVontay called her asking for a ride to Countryside Village. She agreed but asked him to give her ten dollars for gas. The Defendant picked the four men up. She dropped them off on the side of the road once inside the neighborhood. When she asked DeVontay for her gas money, he told her to "pull around to Lorenzo's house, there will be an orange car parked in the driveway on Culver Street." She went to the house and backed into the driveway. When asked why she backed in, the Defendant replied, "No reason particular. Just wanted to back in, not pull in." About five minutes later, the four men arrived at the house, and DeVontay told her wait while he went into the house to get some money. She asked him to hurry because she wanted to return to her girlfriend. Also, at that time, Nicholson asked if he could borrow her jacket, and she gave it to him. All four men disappeared from her view.

She waited "about five, seven minutes, maybe, and nobody came back," so she left. As she was about half way back to Jasmine's house, "[s]even to ten minutes" later, she thought about how expensive the jacket was that she loaned to Nicholson and decided to drive back to retrieve it. When she got back to the house, she again backed into the driveway. Shortly thereafter, the four men returned to her car, and she did not notice anything as they got in the car. They did not say anything to her, except DeVontay asked if she would take them back to Fox's house. The Defendant agreed. She did not recall DeVontay ever calling her to come pick them up.

As they drove out of the neighborhood, no one was talking. As she stopped a stop sign, the door opened, and DeVontay "leaned out and spit." She did not see anything else. Moments later, she saw a police officer drive by, so she instructed DeVontay to put his seatbelt on. She testified that she was driving slow because there were speed bumps in the neighborhood.

Once she was stopped by Deputy Willoughby, she immediately began to look in her wallet for her license, registration, and proof of insurance. When they were stopped, she heard several of the men say "s--t." According to the Defendant, she followed all of the instructions the officer gave her. As she was getting out of the car, she saw DeVontay "pull" the glove box open; it was locked, so he had to break it. He then threw some rubber gloves in the glove box. She was handcuffed and placed in the back of a patrol car.

According to the Defendant, while she was inside the patrol car, she heard everything over the radio that the officers were saying. While in the back of the car, she called her

girlfriend and told her that they had found a bloody shirt in the car. The Defendant testified that she learned of that information from the radio transmission.

The Defendant maintained that she had no knowledge of what the men planned to do. She did not notice that DeVontay was carrying a weapon, and he did not tell her he had a gun. When she picked them up, no one ever discussed what happened at Countryside Village. She further averred that no one ever asked her to slow down to throw the gun out, claiming instead that she stopped simply because there was a stop sign.

On cross-examination, the Defendant acknowledged that her testimony was not entirely consistent with DeVontay's and Nicholson's. She admitted someone had to be lying.

She recalled seeing the police officer drive past her as she exited the neighborhood. She did see his face, but she did not "remember locking eyes with him." She also did not recall the four men ducking down when the officer passed or seeing Fox remove his bloody shirt. She denied that there was ever any discussion, on the way over or on the way back, about what happened to the victim. She did not know why she was being pulled over by the officer. She admitted that she concealed her cell phone before being placed in the back of the patrol car.

The Defendant was asked about her conversation with Det. Williams at the police station. When Det. Williams asked about any possible gunshot residue on her hands, she told him that she "may have handled some bullets that day." On redirect, defense counsel inquired about the possible handling of bullets that day, and the Defendant stated that her grandmother also owned a gun and came by every day to check on her before she went to work. She confirmed that a gunshot residue test was performed on her hands following her arrest. Mabel McCullough was recalled and testified that she had seen her granddaughter, the Defendant, previously handle the bullets for Ms. McCullough's pistol.

A tape recording of the radio transmissions during the traffic stop was played for the jury, during which an officer mentioned the bloody shirt over the radio. The voice on the recording was identified as Deputy England's.[4]

Based upon the foregoing, the jury found the Defendant guilty of the lesser included offense of facilitation of attempted especially aggravated robbery. The trial court sentenced the Defendant to six years in the Department of Correction and denied the Defendant's

---

[4] This deputy's first name is not apparent from the record. It is not entirely clear from the record, but it appears Det. Williams was recalled and provided this testimony identifying the voice on the radio transmission.

request for judicial diversion. Further, the court denied the Defendant's request for alternative sentencing. This appeal followed.

ANALYSIS

On appeal, the Defendant challenges (1) the sufficiency of the evidence underlying her conviction; (2) several evidentiary rulings, including an alleged Brady violation and limitations on two witnesses' testimony; and (3) various sentencing determinations, including the length of the sentence imposed by the trial court and the court's denial of judicial diversion and alternative sentencing.[5] We address each in turn.

*I. Sufficiency of the Evidence*

The Defendant has challenged, among other issues, the sufficiency of the evidence supporting her conviction for the lesser included offense of facilitating attempted especially aggravated robbery. She specifically argues that the evidence is insufficient because no evidence was presented that she "had knowledge that her passengers intended to rob" the victim. The State responds that the "jury was free to consider the credibility of the [D]efendant and determine that she was aware of the criminal activity and that she facilitated it."

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the

_____

[5] For the purpose of clarity, we have reordered the issues as presented by the Defendant in her brief.

guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[, . . . and i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in [a d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

An especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401(a), -403(a). For the purposes of this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2).

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). Thus, in this case, the State was required to prove beyond a reasonable doubt: (1) that the Defendant knew her passengers intended to commit an especially aggravated robbery and (2) that she furnished substantial assistance to these men in the commission of the offense.

The Defendant contends that there was no evidence that she knew the four men were going to attempt to commit an especially aggravated robbery once she dropped them off in Countryside Village. First, we agree with the Defendant that there is no direct evidence which establishes her knowledge of the crime, but this "is often the case in situations such as these where the actions and inner communications of the principals involved would be needed to supply actual details of their knowledge." See State v. Orlando Daniel Garcia, No. W2009-00164-CCA-R3-CD, 2010 WL 3766942, at *6 (Tenn. Crim. App. Sept. 28, 2010), perm. app. denied, (Tenn. Mar. 9, 2011). The Defendant's argument ignores that "elements of an offense may also be established by circumstantial evidence and the inferences derived from the actions of the party or parties involved." Id. Indeed, in this case, the evidence in the light most favorable to the State, showed that the Defendant drove the car to Countryside

Village, waited in a driveway after backing in, was present in that car when the shots were fired, and drove away from the scene once all four men returned to her car.

Based upon DeVontay's testimony that he was armed before the Defendant picked him up and that he had a pair of gloves in his possession at the time of the crime, the jury could have inferred that he had planned to commit a robbery, although he had not determined a specific victim. Nicholson testified that, after arriving in Countryside Village, the Defendant backed her car into Russell's mother's driveway and waited there until the men returned. Testimony established that the men were gone from her car approximately thirty minutes. The jury could reasonably infer that the Defendant was waiting to provide a prompt getaway. After shots were fired in the neighborhood, the men returned to the Defendant's small vehicle with blood on their clothing, and several of the men took off their shirts. The jury could infer that some of the blood was visible to the Defendant. DeVontay testified that, as they drove away, he opened the door to discard the gun. Nicholson testified that DeVontay threw the gun out the window and that the Defendant slowed down for him to do so. Both Sgt. Barnes and Deputy Young testified that, as they passed the vehicle, they saw the passengers "ducking" behind the seats. The jury could reasonably infer that the Defendant had knowledge of the criminal activity, including the possession of a weapon, and that she was assisting the men with their efforts to evade law enforcement.

The jury resolved questions of credibility and conflicts in testimony in favor of the State. It is the jury who is responsible for judging the credibility of the witnesses. Clearly, in this case, they found the Defendant's credibility lacking, and it is not the province of this court to reevaluate such determinations. After review, we conclude that the evidence, taken together, established the element of the knowledge; therefore, the evidence was sufficient to support the Defendant's conviction for facilitation of attempted especially aggravated robbery.

## II. Evidentiary Rulings

Under the broad heading of "the [Defendant] was denied due process of law and the right to present a defense in violation of her constitutional rights[,]" the Defendant makes several challenges to evidentiary rulings of the trial court. First, she alleges a violation of Brady v. Maryland, 373 U.S. 83 (1963), and then, she contends that the trial court improperly precluded her from presenting the testimony of two witnesses.

## A. *Brady* violation

Initially, the Defendant argues that the "State failed to provide to defense counsel exculpatory evidence when it failed to provide the microanalysis report, the gun report and the report regarding the gloves found at the crime scene." The Defendant contends that this evidence was not given to her prior to trial despite three requests from defense counsel for

discovery and that the evidence is "clearly favorable to [her] in that reports do not show that there was any physical evidence that [she] was involved in the crime in which she was charged." The State responds that the Defendant has failed to show that any exculpatory evidence was withheld or that the evidence is material.

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citations omitted).

To prove a Brady violation, a defendant must demonstrate the following:

(1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not);
(2) that the State suppressed the information;
(3) that the information was favorable to the defendant; and
(4) that the information was material.

Id. at 56 (citations omitted). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). In the case of a delayed disclosure of exculpatory information, as opposed to a complete failure to disclose, the inquiry is whether the delay prevented the defense from effectively preparing for and presenting the defendant's case. State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993); see Bagley, 473 U.S. at 682 (stating that failure to respond to Brady request may impair adversary process because defense "might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued").

In response to the allegation of a <u>Brady</u> violation regarding the reports, the prosecutor averred as follows:

> She is the third attorney that's been involved in this case. I have told every single one of those attorneys that they are more than welcome to come over and sit down with me, and go through the file. I know that [defense counsel], on at least one occasion, went over to my office when I was not there, and I instructed my assistant to sit down with her and go through it all.

Defense counsel then stated that she did not believe the prosecutor had done anything improper, but she simply had not seen the reports, which was prejudicial to her client. The trial court overruled the Defendant's objection and allowed the evidence but did not provide any reasoning for so ruling. In her motion for new trial, the Defendant alleged that the reports "exonerated the [D]efendant in that the reports did not show that there was any physical evidence that the Defendant was involved in the crime in which she was charged."

In examining the elements of a <u>Brady</u> claim, we note that, although defense counsel stated she filed requests for discovery, no request appears in the appellate record. Moreover, even assuming that a proper request was made, the prosecutor vehemently disputed that she suppressed the information and defense counsel later tempered her claim. In fact, an agreed order appears in the record, signed by both attorneys, wherein it is agreed that the parties "stipulate to the lab reports of the Tennessee Bureau of Investigation special agents being entered in lieu of their personal appearance in the trial of the above referenced [D]efendant." It does not appear that the State intentionally suppressed the evidence.

Our conclusion that the reports neither help nor harm the Defendant's case is more significant to our analysis. The State never contended that the Defendant was present at the scene of the shooting. During the exchange at trial, defense counsel submitted that she had the report showing gunshot residue testing of the suspects' clothing; however, she submitted that she did not have the report concerning gunshot residue of their hands, the firearm analysis report, and a report about "some gloves." The Defendant describes three reports but does not identify specific documents in the record. The only TBI reports entered as exhibits in the record are the firearm report, the microanalysis report on the suspects' clothing, and a serology/DNA report. Thus, the only challenged report actually entered as an exhibit at trial was the firearm report, which showed that the bullet taken from the victim was fired through the gun found by the police after the shooting.

Neither the firearm report nor the other alleged reports exculpate or incriminate the Defendant. The State never alleged that the Defendant was present at the scene of the shooting where the firearm was used, and the jury was aware that no gunshot residue was

-18-

found on the Defendant's clothing. Her absence from the scene of the shooting does not negate the State's theory that she knowingly assisted in the attempted especially aggravated robbery by being the "getaway" driver. With these considerations in mind, we conclude that any delay did not prevent the defense from effectively preparing for and presenting the Defendant's case. Accordingly, the Defendant failed to sustain her <u>Brady</u> claim, and the trial court committed no error in denying her relief on this basis.

### *B. Limitation on Cross-Examination*

Next, the Defendant contends that the trial "court did not allow defense counsel to adequately question Detective Andy Jackson" and that such a limitation prohibited her from "putting on a defense that would allow her to vindicate herself." We conclude that, because the Defendant has not supported this claim with citation to any legal authority, she has waived our consideration of this issue. <u>See</u> Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.")

### *C. Proffered Testimony*

As her last evidentiary issue, the Defendant argues that the trial court "failed to allow [her] to put on a defense when it did not allow Jasmine Webster to testify as to her complete conversation with [the Defendant] recorded when [the Defendant] was in the back seat of the patrol car." According to the Defendant, this ruling "prejudiced [the Defendant] because the jury was unable to fully interpret [the Defendant's] statements" made during the call.

The recording of the Defendant in the back of Deputy Willoughby's patrol car was admitted as an exhibit at trial. On the recording, the Defendant made a telephone call, and during that conversation, the Defendant informed the person on the phone, Jasmine, that the police found a bloody shirt in the car. The Defendant sought to have Jasmine testify as to her part in the phone conversation that day. The State objected to any testimony by Jasmine about her conversation with the Defendant while the Defendant was inside the patrol car. Defense counsel responded,

> Well, Your Honor, the reason, Jasmine Webster was actually the female that was on the phone with my client, in that tape that was admitted into evidence. So the tape is already there. And she was the other person on the other end. And, also, the prosecution -- of course, this is a facilitation case. And they're trying to prove that she knew what they were gonna do. Jasmine Webster is gonna be able to testify she was with her for the entire day. That was her girlfriend. They're . . . lesbians. And that was her girlfriend at the time.

-19-

. . . .

> . . . The tape is in evidence. They've already heard my client's statement. But she was the other person on the other end. So I don't know how it would be inadmissible for her to talk about the conversation that's already been admitted into evidence.

The State responded that "the tape speaks for itself." Defense counsel cited the Rule of Completeness as a ground for admission. The trial court sustained the objection but did not articulate any particular rationale for barring admission of Jasmine's testimony about her side of the telephone call.

The Defendant argues that the trial court erred in sustaining the State's objections to this line of questioning, contending that she was denied her right to present a witness favorable to the defense. However, the Defendant does not say how Jasmine's comments during the call would have been favorable to her, other than to assert that "the jury was unable to fully interpret her statements." We note that Jasmine was permitted to testify about the time she spent with the Defendant that day prior to the Defendant leaving her company to give the men a ride to Countryside Village. We also note that the Defendant's knowledge of the bloody shirt, and whether it came from radio traffic, was a hotly disputed issue at trial.

The propriety, scope, manner, and control of testimony and other evidence are matters entrusted to the sound discretion of the trial court. State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994); State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994 (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)); see also Tenn. R. Evid. 611. "Absent a clear abuse, which has resulted in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion in matters pertaining to the examination of witnesses." State v. Humphreys, 70 S.W.3d 752, 766 (Tenn. Crim. App. 2001) (citing Coffee v. State, 216 S.W.2d 702, 703 (Tenn. 1948)).

In the exercise of her right to present a defense, an accused generally "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers v. Mississippi, 410 U.S. 284, 302 (1973). The Defendant did not make an offer of proof as to what Jasmine's testimony would have been or how that testimony would have been favorable to the Defendant. Without an offer of proof as to the witness's testimony, we are unable to determine whether the trial court's ruling was error. State v. Baxter, 938 S.W.2d 697, 703 (Tenn. Crim. App. 1996); see also State v. Martin, 642 S.W.2d 720, 724 (Tenn. 1982) (offer of proof needed for appellate court to assess the impact of a ruling). Therefore, we cannot find any abuse of discretion in the trial court's evidentiary ruling on this issue. The

Defendant is not entitled to relief on this issue. See State v. Frank Lee Tate, No. W2004-01041-CCA-R3-CD, 2007 WL 570555, at *17-18 (Tenn. Crim. App. Feb. 23, 2007), perm. app. denied, (Tenn. June 18, 2007).

*III. Sentencing*

The Defendant challenges the trial court's sentencing determinations, taking exception to the imposition of the maximum sentence and the denial of judicial diversion or any form of alternative sentencing. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulate in the record its reasons for imposing the specific sentence. See State v. Susan Renee Bise, -- S.W.3d --, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *20 n.41 (Tenn. Sept 26, 2012).

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing. Id. at *18. Currently, upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at *17. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

At the March 31, 2011 sentencing hearing, Christie Dickey with the Board of Probation and Parole testified that she prepared the Defendant's presentence report. The Defendant provided the following statement to Ms. Dickey regarding her role in the offense:

Judge Hamilton, please let me go home. If you do, I will not give you any problems or get in no trouble. I'm a good person and I'll do good on probation if you choose to let me go home to Detroit, Michigan with my family. To Mr. McCord, my sympathy goes out to you and your family. I didn't hurt you, but do apologize for your pain and suffering, and God bless you.

The Defendant told Ms. Dickey that she was the driver but claimed she did not know what was going to happen. She further told Ms. Dickey that she returned to pick the men up following their phone call but claimed she still had no idea about what had happened.

The presentence report reflected that the Defendant was twenty-two years old at the time of the sentencing hearing, that she had no prior criminal history, and that she left high school in the eleventh grade. According to the Defendant she moved to Tennessee in 2006 to live with her grandmother, who was employed by General Motors. At the time of her arrest, the Defendant was living in her own apartment, but her grandmother paid her rent and expenses.

The Defendant reported that while out on bond for this offense, she returned to Michigan and got a temporary job at General Motors, lasting two and one-half months, and had also obtained her General Equivalency Diploma (GED). Also, according to the Defendant, she worked from 2007 until 2008 with Independent Opportunities as a caregiver for persons with development disabilities. The Defendant stated that she was fired from this job because "she reported overtime and then forgot to report in."

The Defendant reported her mental health as "fair," explaining "that this incident has left her a little depressed, but she has not sought any type of counseling for this." She also reported a past diagnosis for "ADD and ADHD." She was not currently taking any prescribed medications. The Defendant described her physical health as "good," although she had been diagnosed with asthma at age nine and used an inhaler.

The Defendant reported that she first drank alcohol at twenty-one years of age. However, according to the Defendant, she "typically [did] not drink at all." The Defendant also stated that she had never used any non-prescribed or illegal drugs.

The victim again recounted the incident and his injuries, detailing the bullets left in his body, his permanent impairment, and how his ability to work as a truck driver and a mechanic had been impacted. His physical activities were now limited. In order to maintain his employment, he was in pain "[a]ll the time" because he could not take any pain medication and maintain a commercial driver's license. He also testified that he continued

to incur medical bills due to his injuries. While he made less money than he used to, he could still "get by." Furthermore, he stated that this incident had effected him "[a] great deal" emotionally, being less likely to help or associate with others.

The Defendant then called Willie Turrentine and her mother to testify on her behalf. Mr. Turrentine, a church friend, stated that, when the Defendant was around him, she conducted herself as a "[v]ery respectable young lady." He clarified that he had only known the Defendant for six or seven months before the offense. He saw her once or twice a month when she was out on bond, and "she was just acting a like a normal little teenager, very respectful." Mr. Turrentine testified that the Defendant did not "seem to be weighted down by any concerns about what was going on" when he saw her on those occasions and that she never expressed any remorse about what had happened to the victim. According to Mr. Turrentine, the Defendant had the support of her grandmother and did not have any difficulty supporting herself while out on bond.

The Defendant's mother testified that the Defendant had family support, explaining that the family would be able to "house her, feed her, clothe her." She testified about the Defendant's behavior while on bond, stating that the Defendant did not get into any trouble.

After considering the foregoing, the trial court sentenced the Defendant to six years, denied judicial diversion, and denied alternative sentencing. The Defendant alleges that the trial court erred in these determinations.

*A. Judicial Diversion and Alternative Sentencing*

First, we will address the trial court's denial of judicial diversion or any form of alternative sentencing. We address them together, as did the trial court.

*1. Judicial Diversion*

A defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty to a Class C, D, or E felony and has not previously been convicted of a felony or a Class A misdemeanor. See Tenn. Code Ann. § 40-35-313(a)(1)(B). The decision to grant judicial diversion lies within the discretion of the trial court and will not be disturbed on appeal unless it is shown that the trial court abused its discretion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In other words, a denial of judicial diversion will not be overturned if the record contains any substantial evidence to support the trial court's action. Id. Moreover, we observe that "judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion [under Tennessee Code Annotated section] 40-15-105." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's mental and physical health, and (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). The decision should be based on whether the grant of diversion will serve the ends of justice for both the public and the defendant. Id. The record must reflect that the trial court considered and weighed all these factors in arriving at its decision. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Additionally, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). However, the denial of judicial diversion may be based solely on the nature and circumstances of the offense, so long as all of the other relevant factors have been considered, and this factor outweighs all others that might favorably reflect on the defendant's eligibility. State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999).

### 2. Alternative Sentencing

The Defendant was considered to be a favorable candidate for alternative sentencing under the Sentencing Act. A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). In determining a defendant's suitability for alternative sentencing, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code Ann. § 40-35-103(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Ultimately, in sentencing a defendant, a trial court should

impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

Additionally, the Defendant was eligible for probation because the "sentence actually imposed upon [him was] ten (10) years or less." Tenn. Code Ann. § 40-35-303(a), (b). Thus, the trial court was required to consider probation as a sentencing option. Tenn. Code Ann. § 40-35-303(a). However, no criminal defendant is automatically entitled to probation as a matter of law. State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). The defendant has the burden of establishing his or her suitability for full probation. See State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). A defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).

We note, however, that "the determination of whether the Appellant is entitled to an alternative sentence and whether the Appellant is entitled to full probation are different inquiries." Boggs, 932 S.W.2d at 477. The defendant has the burden of establishing his or her suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. Id.; see Boggs, 932 S.W.2d at 477.

### 3. Trial Court's Ruling
In denying the Defendant judicial diversion or any other form of alternative sentencing, the trial court ruled as follows:

> In denying probation, the [c]ourt has considered the [D]efendant's plea for diversion and probation sentence. The [D]efendant may be amenable to correction; if so, she can pursue that in the Tennessee Department of Correction if it's determined that she needs to do so. The circumstances of the offense have been considered. This is a horrible crime and this [c]ourt is convinced that the [D]efendant was a willing participant along with the other four individuals.

> There is no proof that the [D]efendant has any mental or physical health problems; however, should she have any or should she develop any while she is in the custody of the Tennessee Department of Correction, then they are equipped to treat her for those conditions. There is no proof of any prior

-25-

criminal activity on the part of the [D]efendant; although, she is not the first first-time offender this [c]ourt has seen who attends church regularly and has friends that are to be commended for being here on her behalf.

This social history that she had did not stop her, in this [c]ourt's opinion, from participating in this crime. I considered the deterrent effect or the deterrence value to the [D]efendant and others in this community. The deterrent requires some mental decisions on the part of people who have to make a mental commitment not to commit a certain crime because they remember that someone else had done the same thing and had received a sentence, and I would hope that this sentence is a deterrence in this community from deterring one from doing this type of activity.

The [D]efendant evidently has no criminal history, but her first offense was one of the worst crimes I can remember after thirty years on this bench. She now has some criminal activity in her past. We'll never know if judicial diversion would serve the ends of justice, but for the life of me, it's hard for me to look at a person like Anthony McCord and allow this [D]efendant to be released on any type of diversion or probation.

*4. Appellate Review*

On appeal, the Defendant contends that she is a proper candidate for judicial diversion. Specifically, she argues, "The emotional expression by the trial court is not 'substantial evidence' supporting the trial court's decision to deny judicial diversion . . . . [The Defendant] is a young person who the judicial diversion principles were intended to make whole upon successful competition of a term of probation." The State replies that the trial court properly denied judicial diversion.

The record reflects that in denying the Defendant's request for judicial diversion, the trial court considered the required factors. The court considered the Defendant's amenability to correction, the circumstances of the offense, the Defendant's social and criminal histories, her physical and mental health, the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants, and whether diversion would serve the ends of justice. The court placed emphasis on the circumstances of the offense and the special and general deterrence value in denying diversion. The trial court weighed all of the factors and determined that the Defendant was not a suitable candidate for judicial diversion. We conclude that the trial court did not abuse its discretion.

Next, the Defendant states that she is a favorable candidate for alternative sentencing, specifically probation. Specifically, she points to the facts that she "did not personally

-26-

participate in the assault and attempted robbery"; that she had no criminal history or history of alcohol or drug abuse; that she had "significant family and community support," including church attendance; that she "expressed remorse for the victim"; and that she "had a history of employment" and had obtained her GED. The Defendant then states that, "[m]ost importantly," she "is a low risk of re-offending," citing to an assessment by Dr. Jeanine Miller finding the Defendant's "risk of recidivism at less than six percent." The State responds that the trial court properly denied the Defendant probation or any other alternative sentence.

First, we note that the State objected to introduction of Dr. Miller's report, providing the following rationale:

> The State was provided no notice that there was going to be expert testimony provided or any witness opinion report of any kind. I received that yesterday afternoon. I haven't even had a chance to read it or see if I would need to respond to it, so I would object to it coming in.

The trial court sustained the objection and did not consider the report. Because the trial court did not consider the report in rendering its decision, and because any failure in this regard is not raised as an issue on appeal,[6] we likewise will not consider the report.

The record reflects that the trial court based the denial of probation or any other form of alternative sentencing primarily upon the nature and circumstances of the offense and the deterrent effect such a denial would have on the Defendant and others likely to commit similar offenses. The court considered the appropriate sentencing principles, i.e., the circumstances of the offense; the Defendant's criminal record, social history, and present condition; the deterrent effect; the Defendant's potential for rehabilitation; and whether probation would serve the ends of justice and the best interests of the Defendant and the public. Thus, we conclude that the trial court did not abuse its discretion in denying probation or any other form of alternative sentencing.

### B. Length of Sentence

Next, we will address the Defendant's challenge to the length of the sentence imposed by the trial court. Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Accordingly, Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

---

[6] The issue was raised in the Defendant's motion for new trial, and the report was entered as an exhibit to that hearing.

-27-

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, *the court shall consider, but is not bound by, the following advisory sentencing guidelines*:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

(d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d) (emphasis added).

The 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement factors when adjusting the length of a sentence. Bise, 2012 WL 4380564, at *17. In accordance with the broad discretion now afforded a trial court's sentencing decision,

misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

The Defendant argues that her sentence is excessive because the "circumstances of [her] involvement in the offense were not particularly egregious or beyond those inherent in any facilitation of attempted aggravated robbery" and because the "trial court erroneously applied the mitigating factors." She further contends that the "trial record is void of the requisite affirmative showing that the trial court considered the sentencing principles and all

the relevant facts and circumstances." The State responds that the trial court properly determined that the six-year sentence was appropriate for the offense committed.

The Defendant was a Range I, standard offender who was convicted of a Class C felony; therefore, she was subject to a sentence between three and six years. See Tenn. Code Ann. § 40-35-112(a)(3). The trial court enhanced the Defendant's sentence to the maximum within the range. Both parties agree that the trial court did not make any explicit determinations regarding enhancing and mitigating factors, but both contend that the trial court implicitly found factor six, that the personal injuries of the victim were particularly great. See Tenn. Code Ann. § 40-35-114 (6).

Given the new directive of Bise from our supreme court, upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Bise, 2012 WL 4380564, at *17. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, we reiterate that the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. The trial court's imposition of a six-year sentence based upon the seriousness of the offense is supported by the record and comports with the purposes and principles of our Sentencing Act. Therefore, we conclude that the trial court did not abuse its discretion in sentencing the Defendant to six years in the Department of Correction.

CONCLUSION

In sum, we conclude that the evidence was sufficient to sustain the Defendant's conviction and that the trial court did not err in its sentencing determinations. The Defendant's additional evidentiary issues are likewise without merit. Accordingly, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-29-